## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## 1:09cv229

ENCOMPASS ADVISORS, LTD.,       )
                                 )
      **Plaintiff,**           )
                                 )
Vs.                          )      **MEMORANDUM AND**
                                 )      **RECOMMENDATION**
UNAPEN, INC.; DAVID GEMMA;   )
and JOAN WALKER,           )
                                 )
      **Defendants.**         )
_____   )

**THIS MATTER** is before the court on defendants' Motion to Dismiss or, in the Alternative, to Transfer Venue (#9). The court has before it plaintiff's Complaint (Docket Entry #1)(as well as what appear to be attachments thereto), defendants' Memorandum in Support (#10), plaintiff's Brief in Opposition (#18)(and attachments thereto, Docket Entry #19), and defendant's Reply in Support (#28). While defendants have moved to dismiss certain claims and transfer this action under various provisions of law, the key issue is whether transfer is mandated or merely discretionary. For the following reasons, the undersigned respectfully determines that this dispute is governed by a contract in which the parties agreed to litigate this dispute in New Haven, Connecticut, and will recommend transfer under 28, United

States Code, Section 1404.

## FINDINGS AND CONCLUSIONS

## I.    Introduction

This action involves an alleged breach of contract concerning the alleged provision of defective software and software support services.  As with much of modern commerce, the subject software was remotely installed on plaintiff's server via the internet with defendants having no physical presence in this forum.  Likewise, plaintiff, a small business located in this district, did not travel to defendants' place of business in Connecticut.  Plaintiff contends in this action that the ClientLogix software failed to perform as advertised, that defendants have breached the contract, and that they have engaged in fraudulent conduct warranting trebled damages under North Carolina's Unfair and Deceptive Trade Practices Act as well as similar Connecticut law.

As discussed above, the issue presented is a narrow one: is plaintiff's claim for breach of contract governed by the 2006 Master Agreement, which does not have a forum selection clause, or is it governed by a document entitled "2007 UNAPEN ITComplete Basic Plus Service Agreement" which does have a forum selection clause?

Of relevance to the issue presented is a copy of: (1) the "Master Agreement"

dated November 27, 2006 (Docket Entry #19-2), hereinafter "Agreement One"; (2)"Schedules A, B, C, and D, for ClientLogix' dated January 16, 2007, "part of SOFTWARE SUBSCRIPTION AGREEMENT dated Nov 27, 2006" (Docket Entry #19-3), hereinafter "Agreement Two"; and (3) UNAPEN ITComplete Basic Plus Services Agreement dated July 27, 2007 (Docket Entry # 19-4), hereinafter "Agreement Three."

First, the court has reviewed the Complaint. At paragraph 13 of the Complaint, plaintiff describes the first two agreements by name and date. No mention is made in that paragraph as to Agreement Three. While plaintiff discusses other contacts it had with defendants or their employees in July 2007, it makes no mention of Agreement Three which was entered into that month.

Second, the court has reviewed plaintiff's Response as well as the affidavits and other materials attached thereto. In relevant part, plaintiff argues that its claims against defendants stem from Agreement One and not Agreement Three. Plaintiff argues in its brief that "[t]he specific software being sold and serviced under the original Master Agreement [Agreement One] was not the software which is the subject of this lawsuit," Response, at 2, and "the Master Agreement did not provide for a required forum of any kind." Id. Plaintiff further argues that Agreement Two, the Schedules to the Master Agreement, "specifically and solely related to the sale of

ClientLogix software and the installation of said software," id., at 3, and that "nowhere did it provide for a forum selection clause." Id. Plaintiff describes Agreement Three, which contains a forum selection clause, as an "agreement provided solely for the provision of computer and software maintenance services, separate and distinct from the previous agreement for the purchase of ClientLogix entered into on January 16, 2007." Id.

The court has also considered the defendants' Reply to such argument. Defendants argue that plaintiff's reliance on Agreement One is misplaced for two reasons.

First, defendants argue that all of plaintiff's claims involve its subscription to defendants' program called ClientLogix. Reply, at 2. At the time the suit was filed, plaintiff's use of such product was being "monitored, updated, and implemented" pursuant to Agreement Three, which contained the choice of venue provision. Id. Defendants contend that any claims concerning failures of such program "necessarily involves interpretation of the terms and conditions" of Agreement Three. Id.

Second, defendants argue that if plaintiff is actually relying on Agreement One or Agreement Two, which is incorporated in Agreement One, any dispute arising from such agreement must, by the terms of such agreement, be brought "**within two years of that agreement**," which was formed on November 27, 2006. Id., at 2-3

-4-

(emphasis in the original). Defendants argue that if the court were to find that this action was brought on Agreement One or Agreement two, it would be required to dismiss the action as time barred. The undersigned must, respectfully, take issue with defendants' characterization of the language of the contract.[1] Agreement One does not provide that an action must be brought "**within two years of that agreement,**" id., instead the agreement provides as follows:

> 11.4 Neither party may bring any action, regardless of form, arising out of this Agreement, **more than two years after the cause of action has arisen**....

Master Agreement (Agreement One), at ¶ 11.4. There is a substantial difference between when a contract forms and when a cause of action arises, especially where the contract "shall continue for two years," id., at ¶ 7.1, and provides not just for the delivery of goods, but a "subscription" for provision of certain services during such period. Id., at ¶ 2 *et seq.* While parties could certainly agree to a limitation of action from a fixed point such as contract formation, most breaches occur when a party fails to perform a promise:

> As for the breach of contract claim, a cause of action arises when a party's performance is due under a contract, and that party does not fully perform. *See* Restatement (Second) of Contracts § 235(2) cmt. b.

---

[1] The undersigned has assumed that such mischaracterization was attributable to a misreading of the agreement.

First Capital Corp. v. Country Fruit, Inc., 19 F.Supp.2d 397, 400 (E.D.Pa. 1998).

Reading the contract alongside the Complaint, the undersigned simply cannot find that the two year limitation of action commenced from contract formation, rather the language of the contract appears to provide that the limitation is two years "after the cause of action has arisen." No argument having been made that the claims asserted herein were asserted more than two years after they arose, the second argument will be disregarded as it is not probative to the issue of transfer.

## II. Discussion

### A. Forum Selection Clause

Even though not specifically mentioned in the Complaint, the undersigned has considered whether Agreement Three is implicated by plaintiff's causes of action. The intent of the parties in entering into Agreement Three appears self evident:

> Whereas CUSTOMER is the owner/lessee of certain Computer Software for which CUSTOMER desires UNAPEN ITComplete (TM) Basic Plus Services . . . .
> * * *
> (d)  "Computer Software" shall mean . . . computer software programs as listed in Schedule A.
> * * *
> (g)  "UNAPEN ITComplete (TM) Basic Plus Services" shall mean reviewing system operation and logs and applying appropriate patches and/or updates to the Computer Software as Specified in Schedule A.

Agreement Three, Docket Entry #19-4, at 1. The agreement goes on to list in

"Schedule A" under "Critical Applications" the product "ClientLogic." Id., at 8.

With such aspects of Agreement Three in mind, the undersigned has next reviewed the allegations of the Complaint to determine whether consideration of Agreement Three is necessary in affording complete relief in this matter. In paragraph 19 of the Complaint, plaintiff alleges in pertinent part, as follows:

> 19. Beginning in January 2007 and continuing through October 2007, Unapen caused elements of its software programs to be downloaded and installed on plaintiff's computers . . . . Almost immediately Green began to make specific requests to Unapen that they provide Encompass with the software functionality which had been promised by them . . . . Unapen's response to these requests was to make a series of tweaks or changes . . . to the installed software programs in an attempt to provide the functionality . . . . **Encompass was required to pay hourly rate charges to Unapen for all such changes. Unapen should not have charged Encompass for changes necessitated by the failure of their software to function as initially promised. All such additional work was performed by Unapen employees who accessed and entered Encompass's server . . . .**

Complaint, at ¶ 19 (emphasis added). As discussed in Schedule C to Agreement One, Schedule B to Agreement Three provided "Hourly Rates" and apparently governed the rates charged for provision of software services from July 27, 2007, forward. Clearly, July 27, 2007, is well within the period when defendants purportedly provided ineffective services "at hourly rates," which are themselves clearly part and parcel of Agreement Three. Plaintiff goes on to allege in relevant part, as follows:

22. Through the end of 2007 Unapen had achieved only a very limited and unsophisticated interface between ClientLogix and PortfolioCenter data. Encompass had paid Unapen a total of $41,661.58 for the initial licenses and user fees and the subsequent "work" done by Unapen to achieve the functionality promised initially, but never achieved. . . .

Id., at ¶ 22. After expressing a number of causes of action under both North Carolina and Connecticut law, plaintiff seeks in the *ad damnum* clause that "it be awarded damages . . . **all sums** paid by plaintiff to Unapen for ClientLogix and SalesLogix, initially and in **subsequent** payments for 'enhancements' to ClientLogix." Id., *Ad Damnum* Clause, at ¶ (a)(emphasis added).

Plaintiff avers through its president that Agreement Three is a "separate and distinct contract" than that for which it is seeking damages and relief. Affidavit of Encompass President Jon Green, at ¶ 15. While no direct mention is made by plaintiff of Agreement Three in its Complaint, the undersigned cannot find that Agreement Three is either separate or distinct. In its Complaint, plaintiff clearly takes issue with the services provided under such Agreement Three and seeks to recoup "all sums" paid pursuant to any agreement. Plaintiff has in no way limited its claims to sums paid up to July 26, 2007, and its own allegations speak to wrongful acts occurring in service of software well into the next year. Put another way, plaintiff's claim is not only that the software was not fit for its intended use, but that the services provided by defendants in maintaining, trouble shooting, and

"enhancing" such software both before and after July 27, 2009, were rendered incompetently and/or ineffectually, and  that they are entitled to recoup all fees in addition to licensing fees for the software.  Reading the Complaint and the agreements together,  Agreement Three is integral to the relationship of these parties and plaintiff's causes of action: the breach alleged is not just as to the provision of software, but in the provision of software support services, which were clearly provided pursuant to Agreement Three.  There is no question but that Agreement Three contains a forum selection clause: "[t]he parties further agree and consent to the venue of New Haven, Connecticut."  Agreement Three, at ¶ 10.5.

Agreement Three being implicated by the Complaint, and it appearing that the parties agreed to litigate in another forum, the question becomes whether the forum selection clause has any application to earlier agreements which appear to be part of the same transaction.

> [W]e must interpret the forum selection clause in the context of the entire contractual arrangement and we must give effect to all of the terms of that arrangement. *See Richland Plantation Co. v. Justiss-Mears Oil Co., Inc.*, 671 F.2d 154, 156 (5th Cir.1982) ("When several documents represent one agreement, all must be construed together in an attempt to discern the intent of the parties, reconciling apparently conflicting provisions and attempting to give effect to all of them, if possible."). Given our conclusion that the arbitration provision in the Product Development Agreement applies to all claims related to the overall transaction, we must therefore interpret the forum selection provision in the Stock Purchase Agreement in a manner that is

consistent with the arbitration provision.

Personal Sec. & Safety Systems Inc. v. Motorola Inc., 297 F.3d 388, 395 -396 (5th Cir. 2002). While such Fifth Circuit decision is helpful, the undersigned has also looked to legal commentators for assistance in determining the impact of a forum selection clause in one of a series of agreements that relates to what appears to be one contractual relationship. In *Williston on Contracts*, the following commentary is helpful:

> Apart from the explicit incorporation by reference of one document into another, the principle that all writings which are part of the same transaction are interpreted together also finds application in the situation where incorporation by reference of another document may be inferred from the context in which the documents in question were executed. Thus, in the absence of anything to indicate a contrary intention, instruments executed at the same time, by the same contracting parties, for the same purpose, and in the course of the same transaction will be considered and construed together as one contract or instrument, even though they do not in terms refer to each other. The rule applies even where the parties to the instruments are not the same, so long as the writings form part of a single transaction and are designed to effectuate the same purpose. Moreover, when the same parties execute two instruments concerning the same subject matter, they may, under some circumstances, be regarded as one contract and construed together whether made simultaneously or on different days, the fact that they were made or dated at different times being insignificant if they are related to and were part of the same transaction. For instance, where a contractual transaction involves a proposition and a response, the two writings should clearly be construed together. And where the execution of one contract depends upon the execution of other contracts, the contracts must be construed collectively. However, several instruments executed between the same parties at or about the same time will not be

construed together where they do not relate to the same matter and are not only independent of each other, but in a sense antagonistic and cannot operate together.

* * *

It is important to note that even though several instruments relating to the same subject and executed at the same time should be construed together in order to ascertain the intention of the parties, it does not necessarily follow that those instruments constitute one contract or that one contract was accordingly merged in or unified with another so that every provision in one becomes a part of every other. Whether separate agreements are actually part of one transaction is a question of fact, which depends upon the intention of the parties. While there is also authority that the court must limit its inquiry to the four corners of a contract, and cannot rely on the allegedly incorporated document to conclude that an otherwise complete agreement is inadequate, it is more commonly held that the intention of the parties can be determined by consideration of all the agreements or instruments and the relevant surrounding circumstances. In any event, the rule that separate instruments executed at the same time and relating to the same subject may be considered together and may be construed as one contract can be employed only for the purpose of giving effect to the intention of the parties, and is not to be applied arbitrarily and without regard to the realities of the situation, when to do so would be contrary to the intention of parties and would in fact avoid an essential part of the contract. Construing contemporaneous instruments together means simply that if there is any provision in one instrument limiting, explaining, or otherwise affecting the provisions of another, they will be given effect as between the parties themselves and all persons charged with notice so that the intent of the parties may be carried out and the whole agreement actually made may be effectuated. This does not mean that the provisions of one instrument are imported bodily into another, contrary to the intent of the parties.

* * *

Yet it should be observed that the existence of an earlier writing or statements made in such a writing if known to both parties to a later writing, are part of the surrounding circumstances, and however disconnected the transactions may be which gave rise to the two

writings, the existence or contents of the earlier may explain the meaning of the later, and, if so, should be admissible in evidence.

When two documents do not form the separate parts of a single agreement, this does not mean that one of them may not be relevant to the construction of the other; a contemporaneous writing known to the parties may shed light on the interpretation of a contract without being part of the contract. Moreover, reference to an extraneous document may be essential to the interpretation and construction of a contract because, even though the writings in question were neither executed on the same day, nor made by the same parties, the later writing may so far pertain to the same transaction as the earlier that its meaning at the time and place that it was made can be understood only by reference to the earlier writing.

\* \* \*

On the other hand, to the extent that such a rule can be applied consistently with the intent of the parties, two agreements of a similar nature between the same parties will not be read together where the later one expressly states that it supersedes and annuls the prior one.

WILLSTN-CN § 30:26 (footnotes omitted).

The court has first considered whether reading a forum selection clause into Agreement One would be offensive to any provision of that contract. While there is not a forum selection clause in Agreement One or Agreement Two,[2] Agreement One does contain a choice of law provision providing that the law of the State of Connecticut shall govern such agreement(s). Agreement One, at ¶ 11.5. An identical choice of law clause is found in Agreement Three. Agreement Three, at ¶ 10.5. The

---

[2] Agreement Two appears to have been integrated specifically into Agreement One.

undersigned determines that the forum selection clause in Agreement Three, selecting Connecticut, would not offend Agreement One as (1) it would not be inconsistent with contrary language in Agreement One and (2) Connecticut was designated in that agreement as being the source of applicable law.

Rather than two or three distinct transactions, the undersigned finds that the three agreements were simply part of one transaction, the provision of specialized business software in the financial services industry. As plaintiff's Complaint makes clear, the purchase of specialized business software is inseparable from the provision of professional software support services by the vendor. All three agreements - - even though executed on different dates and addressing discrete aspects of the relationship - - involve the same transaction, which is the provision of business software that would assist plaintiff in managing its client portfolios.

Because all writings that are part of the same transaction should be interpreted together, the undersigned finds that the forum selection clause in Agreement Three is applicable to all aspects of this transaction. Even if it was not, it appears that the claims asserted in the Complaint concerning the provision of support services are inseparable from the claims as to defective software, and as such would merit a recommendation that the entire action be transferred to the District of Connecticut.

**B.      Section 1404 Transfer**

As in this case, which was removed from the North Carolina General Court Justice, Superior Court Division, Transylvania County (Docket Entry #1), venue of an action that is removed to a federal court from a state court based on a claim of diversity jurisdiction is governed by the venue provisions of 28, United States Code, Section 1441(a). Godfredson v. JBC Legal Group, P.C., 387 F.Supp.2d 543, 547 (E.D.N.C.2005); see also Three M Enterprises, Inc. v. Texas D.A.R. Enterprises, Inc.,368 F.Supp.2d 450, 455-56 (D.Md. 2005). Section 1441(a) provides in relevant part that "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, *to the district court embracing the place where such action is pending.*" 28 U.S.C. § 1441(a)(emphasis added). The district court in Three M Enterprises, Inc. explained:

> By requiring removal to the district court for the district in which the state action is pending, Section 1441(a) "properly fixes the federal venue in that district." *Hollis v. Florida State University,* 259 F.3d 1295, 1300 (11th Cir.2001). Indeed, courts have recognized that Section 1441(a) establishes federal venue in the district where the state action was pending "as a matter of law," even if venue would be "improper under state law when the action was originally filed." *See Hollis,* 259 F.3d at 1300 (citing *Serrano v. United States Fire Ins. Co.,* No. EP-00-CA-255-DB, 2000 WL 33348220, *1-2 (W.D.Tex. Nov. 7, 2000); *Bacik v. Peek,* 888 F.Supp. 1405, 1413 (N.D.Ohio 1993); and R. Givens, 1 Manual of Federal Practice § 2.28 (5th ed.1998)).

Id., at 454 (footnote omitted). The district court in Three M Enterprises, Inc. went on to note that while Section 1441(a) does not give "a removing defendant a choice of

-14-

districts to which to remove, and that it would not be entirely accurate to characterize removal as the voluntary relinquishment of a legal right," it is "the fact that the removal statute establishes venue as a matter of law [that] precludes Defendants' instant Motion to Dismiss or transfer the action based on <u>improper</u> venue." <u>Id.</u>, at fn. 4 (citation and corresponding quotation marks deleted; emphasis added).  <u>See also</u> <u>Kerobo v. Southwestern Clean Fuels Corp.</u>, 285 F.3d 531 (6th Cir. 2002)(venue in a case removed from state court is governed solely by § 1441(a), requiring denial of motion to dismiss or transfer venue under Section 1406(a)).

Thus, there is no basis for this court to either dismiss plaintiff's claims under Rule 12(b)(3) or transfer this action to Connecticut  based on <u>improper</u> venue under Section 1406 as the Western District of North Carolina is, by virtue of defendants' removal, a proper venue.   The district court in <u>Godfredson</u>, held as follows:

> Although defendants' reasoning is unassailable, their argument nonetheless suffers from a fatal flaw: 28 U.S.C. § 1391 does not apply when, as here, defendants remove a case to federal court from state court.

<u>Godfredson v. JBC Legal Group, P.C.</u> , <u>supra</u>, at 555.  The district court went on to explain that

> Venue for a removed action is fixed . . .by the removal statute, 28 U.S.C. § 1441(a), which limits venue to "the district court of the United States for the district and division embracing the place where such action is pending." *See id.*; 28 U.S.C. § 1441(a). Because § 1441(a) only allows

one possible venue for removal, "once a case is properly removed to federal court, a defendant cannot move to dismiss on § 1391 venue grounds."

Id., at 555 -56 (citation omitted).  Instead, venue must be considered under 1441(a).

Recognizing such distinction, defendants have properly relied on 28, United States Code, Section 1404(a), in support of their request for discretionary transfer. For cause, defendant cites the court to the forum selection clause contained in Agreement Three, which the undersigned found above to apply to this Complaint. Made applicable under the venue provisions of Section 1441, Section 1404(a) provides, as follows:

For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

28 U.S.C. § 1404(a). When presented with a motion under Section 1404 that is based on a forum selection clause in a contract, "the Supreme Court has held that the validity of a forum selection clause is to be determined under federal law," Rice v. BellSouth Adver. & Publ'g Corp., 240 F.Supp.2d 526, 528 (W.D.N.C. 2002), and "[f]orum selection clauses are prima facie valid and enjoy a presumption of validity." Blue Mako, Inc. v. Minidis, 472 F. Supp. 2d 690, 704 (M.D.N.C. 2007).  In Rice v. BellSouth Adver. & Publ'g Corp., 240 F. Supp. 2d 526, 528 (W.D.N.C. 2002), this court established four factors for determining whether a forum selection clause is

unreasonable, which requires consideration of whether:

> (1) their formation was induced by fraud or overreaching; (2) the complaining party will for all practical purposes b[e] deprived of his day in court because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy; or (4) their enforcement would contravene a strong public policy of the forum state.

Id., at 529.    As defendant points out, plaintiffs have made no argument that the forum selection clause offends any of the four factors of Rice.  Plaintiff has not shown that such clause was formed through overreaching, and it would appear from the inception of the agreements that the parties anticipated that Connecticut law would govern.

While plaintiff asserts the burden would fall heavily on its small business, the court finds that no objective evidence has been proffered of grave inconvenience or unfairness in its selection of the courts of Connecticut; while the courts of Connecticut are a substantial distance away, it is the same distance defendants would have had to travel to defend this action in this forum.  As a matter of law, there is no fundamental unfairness in applying Connecticut contract or tort law inasmuch as the agreement between these parties, from its inception, contemplated that Connecticut law would govern any dispute that arose.  While the enforcement of any forum selection clause that does not specify North Carolina as the  forum would contravene the "strong public policy of North Carolina," N.C.Gen.Stat. § 22B-3, such a policy

does not invalidate the forum selection clause. Thus, weighing these factors the court determines that the forum selection clause is reasonable and having determined that the agreement is valid, the court will next consider other relevant factors that are part of the Section 1404(a) analysis.

## C.   Discretionary Transfer: Balancing Relevant Factors

In <u>Jim Crockett Promotions, Inc. v. Action Media Group, Inc.</u>, 751 F. Supp. 93 (W.D.N.C. 1990), this court established a litany of considerations applicable to any motion to transfer made under 28, United States Code, Section 1404(a).  In order to determine whether transfer is proper, a balance must be struck between the competing interests.  Unless the balance is tipped strongly in favor of the moving party, <u>Collins v. Straight, Inc.</u>, 748 F.2d 916, 921 (4th Cir. 1984), plaintiff's choice of forum should not be disturbed.  Upon a motion to transfer, the moving party carries the burden, 1A Moore's Federal Practice, paragraph 0.345[5] at 4360 (Matthew Bender 1990); and the burden is heavy, <u>Datasouth Computer Corp. v. Three Dimensional Technologies, Inc.</u>, 719 F. Supp. 446, 451 (W.D.N.C. 1989).

> A defendant carries a particularly heavy burden when it moves pursuant to [Section] 1404(a) to transfer an action from a district where venue is proper.  As this court has noted previously, it is "black letter law," that "plaintiff's choice of a proper forum is a paramount consideration in any determination of a transfer request, and that choice . . . should not be lightly disturbed."

<u>Phillips v. S. Gumpert Co., Inc.</u>, 627 F. Supp. 725, 726-27 (W.D.N.C. 1986) (citations omitted) (<u>quoting</u> <u>Western Steer Mom 'N' Pop's v. FMT Invs., Inc.</u>, <u>supra</u>, at 265). As discussed above, a valid forum selection clause shifts that burden to the party resisting transfer in conformity with such agreement.

As provided in <u>Jim Crockett Promotions, Inc.</u>, the considerations relevant to discretionary transfer of venue are, as follows:

1.    The plaintiff's initial choice of forum;

2.    The residence of the parties;

3.    The relative ease of access of proof;

4.    The availability of compulsory process for attendance of witnesses and the costs of obtaining attendance of willing witnesses;

5.    The possibility of a view;

6.    The enforceability of a judgment, if obtained;

7.    The relative advantages and obstacles to a fair trial;

8.    Other practical problems that make a trial easy, expeditious, and inexpensive;

9.    The administrative difficulties of court congestion;

10.   The interest in having localized controversies settled at home and the appropriateness in having the trial of a diversity case in a forum that is at home with the state law that must govern the action; and

11.    The avoidance of unnecessary problems with conflict of laws.

Id.,at 7-8. Courts should make both a quantitative and a qualitative analysis of the factors. McDevitt & Street Co. v. Fidelity and Deposit Co., 737 F. Supp. 351, 354 (W.D.N.C. 1990).

The Supreme Court has addressed the impact of a forum selection clause on such analysis. In Stewart Organization, Inc. v. Ricoh Corp., 487 U.S. 22 (1988), the Supreme Court held, as follows:

> Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an "individualized, case-by-case consideration of convenience and fairness." *Van Dusen v. Barrack*, 376 U.S. 612, 622, 84 S.Ct. 805, 812, 11 L.Ed.2d 945 (1964). A motion to transfer under § 1404(a) thus calls on the district court to weigh in the balance a number of case-specific factors. **The presence of a forum-selection clause such as the parties entered into in this case will be a significant factor that figures centrally in the district court's calculus**. In its resolution of the § 1404(a) motion in this case, for example, the District Court will be called on to address such issues as the convenience of a Manhattan forum given the parties' expressed preference for that venue, and the fairness of transfer in light of the forum-selection clause and the parties' relative bargaining power. The flexible and individualized analysis Congress prescribed in § 1404(a) thus encompasses consideration of the parties' private expression of their venue preferences.

Id., at 29-30 (emphasis added). Based on the reasoning of Stewart, the presence of a forum-selection clause requires consideration of the convenience of the proposed forum and the fairness of transfer in light of the forum selection clause, id., making

such a provision a significant factor in the eleven-step analysis.

As to the weight the forum selection clause should be given in the analysis, the Court in <u>Stewart</u> also provides guidance on this issue:

> we disagree with the court's articulation of the relevant inquiry as "whether the forum selection clause in this case is unenforceable under the standards set forth in *The Bremen*." 810 F.2d, at 1069. Rather, the first question for consideration should have been whether § 1404(a) itself controls respondent's request to give effect to the parties' contractual choice of venue and transfer this case to a Manhattan court.

<u>Id.</u>  While plaintiff in essence argues that the court should not even consider the forum selection clause, it would appear based on <u>Stewart</u> that the agreement should be integrated into the court's weighing of considerations as required by Congress under Section 1404(a), because "the instructions of Congress are supreme." <u>Id.</u>, at 30.  With those issues in mind, the undersigned will conduct the required review:

### a.    The plaintiff's initial choice of forum.

In this case, plaintiff clearly desires to litigate this matter in the Western District of North Carolina and if it has its complete choice, in the North Carolina General Court of Justice in Transylvania County.  While initially assigning this choice great weight, the undersigned has also considered this choice of forum in light of the forum-selection provision contained in Agreement Three as read with the other agreements constituting this transaction.  Inasmuch as plaintiff's "initial choice of forum" came

subsequent to an agreement requiring plaintiff to litigate this matter in Connecticut, the undersigned will give the plaintiff's choice of this forum diminished weight, finding that such factor is neutral.

### b.    The residence of the parties.

This factor is unaffected by the choice of forum provision.  Plaintiff resides in this district and defendants appear to be a corporate and individual residents of Connecticut.  This factor is neutral.

### c.    The relative ease of access of proof.

This factor is unaffected by the choice of forum provision.  Plaintiff's action is, essentially, for breach of contract and unfair and deceptive trade practices.   While there will most certainly be at least one witness from North Carolina, Mr. Green, the alleged misrepresentations, failure to properly develop appropriate software, and failure to provide proper support services, allegedly occurred in Connecticut.  Defendants' employees, including software developers and IT specialists and any notes, programs, or hardware they may have, are likely all found in the State of Connecticut.  This factor favors transfer.

### d.    The availability of compulsory process for attendance of witnesses and the costs of obtaining attendance of willing witnesses.

In the event of transfer, under Rule 45 it would appear that the witnesses located

within this district would be outside the subpoena power of the Connecticut district court for trial, but that such witnesses could be subpoenaed for depositions within this district through process issued by this court.  In the event any witnesses located in this district were unwilling to attend trial in Connecticut, such deposition testimony could be admissible as that of an unavailable witness.  If, however,  this matter were kept here, it would appear that there would be little concern as to compulsory process inasmuch as many of the Connecticut witnesses would likely be employees or agents of the defendants.  The court, however, notes the fluidity of employment in the software industry, which is likely to make employees who worked on this project "former employees."

Regardless of where this action is tried, there will be substantial costs to both sides for travel to and from both North Carolina and Connecticut.  Inasmuch as defendants will likely have the bulk of witnesses and it appearing that those witnesses are located in Connecticut, it is likely that plaintiff will incur the bulk of travel costs.

The choice of forum provision does impact consideration of this factor.  In <u>AC Controls Co., Inc.  v.  Pomeroy Computer Resources, Inc.</u>, 284 F.Supp.2d 357 (W.D.N.C. 2003), this court found that in every diversity action, one side or the other will inevitably be burdened, and that such burden was foreseeable when the parties negotiated the contract containing the forum selection clause.  <u>Id.</u>, at 362.  While this

factor appears initially neutral at best, this factor favors transfer to Connecticut when considered in light of the forum-selection clause.

### e. The possibility of a view.

This factor is neutral in that there is nothing tangible to view other than material available on the internet or an in court demonstration of the business software. There would be no reason to view the headquarters of defendants in Connecticut or the office of plaintiff in Brevard.

### f. The enforceability of a judgment, if obtained.

This factor is also neutral inasmuch as a judgment obtained in a federal court in Connecticut is - - as is a judgment obtained in this court - - enforceable nationwide.

### g. The relative advantages and obstacles to a fair trial.

This factor is neutral in that a fair trial can be obtained in any federal court for either side.

### h. Other practical problems that make a trial easy, expeditious, and inexpensive.

There appear to be no other practical problems outside of the factors previously considered that make trial any easier here than in Connecticut. This factor is neutral.

### i. The administrative difficulties of court congestion.

There appears to be no significant difference in court congestion. Indeed, the

Asheville Division is currently running without a backlog. The court is without data presented by the parties as to court congestion in New Haven; however, from experience, the court assumes that most districts operate with backlogs as criminal cases must be addressed first under the Speedy Trial Act. Assuming statistical data was presented to such effect, this factor would likely weigh in favor of retention.

> **j.** **The interest in having localized controversies settled at home and the appropriateness in having the trial of a diversity case in a forum that is at home with the state law that must govern the action**.

In addition to a forum selection clause, there is also a clause concerning choice of laws. In this case, plaintiff and defendant agreed at the time each agreement was entered that Connecticut law would govern. While there is interest in having plaintiff's dispute resolved in this community, inasmuch as plaintiff is a corporate resident of this district, the overriding localized interest would be in Connecticut inasmuch as that appears to be the locus of defendants' business and the place from which it likely contracts with many other end users. Clearly, the Connecticut courts would be more at home with Connecticut law governing contracts. This factor favors transfer.

> **k.** **The avoidance of unnecessary problems with conflict of laws.**

This factor is neutralized through the choice of laws provisions.

* * *

Having considered all of the factors individually, the undersigned will now consider all the factors cumulatively. Quantitatively, the factors weigh three to one in favor of transfer to the District of Connecticut. Qualitatively, a similar result is reached. When the parties' expressed and contracted for preference for that venue is considered, it appears to the undersigned that this court should honor that contractual preference and transfer this matter to the District of Connecticut. While plaintiff essentially argues that the burden of litigating in Connecticut is greater on its small business, it has not been argued or shown that plaintiff is operating an unsophisticated or unprofitable business. Indeed, the undersigned gathers from the pleadings that plaintiff operates a business where great risk is undertaken and managed. It would be difficult to argue that this plaintiff was unaware of the risk, or would be surprised to discover, that doing business with an out-of-state vendor of software exposes it to the risk of litigation in a foreign forum. The difficulty of such argument is compounded where an agreement is signed selecting the foreign forum. It is a commonplace that parties accept unfavorable terms in exchange for desirable outcomes. Defendants do not argue that Fidelcor manipulated the circumstances which resulted in this agreement, nor can they contend that the forum-selection clause itself is unreasonable or unjust. What we have here, is the unremarkable story of a borrower in a weak bargaining position agreeing to a common, albeit displeasing, term. Other than defendants' conclusory allegations, there is no evidence of duress, fraud, or even unfairness.

CIT Group/Credit Finance Inc. v. Lott, 1993 WL 157617, *2 (N.D.Ill. 1993). Such provisions are nothing new in contracts, because forum-selection "provisions such as the one at issue here are commonplace. . . ." 2215 Fifth Street Associates v. U Haul Intern., Inc., 148 F.Supp.2d 50, 58 (D.D.C. 2001). For example, if plaintiff were supplying portfolio management services to clients in Alaska, Hawaii, and Maine, it would certainly behoove plaintiff to include a forum selection clause in any account agreement;[3] otherwise, plaintiff could well be haled into court in any number of jurisdictions for services it provides to its various clients. While forum selection clauses allow businesses to expand into foreign markets, they also provide clients with a wider array of choices in the marketplace, thus encouraging competition and lower pricing. It is only when a deal goes pear shaped that the economic realities of the trade off come to fruition.

In this case, plaintiff clearly sought the benefits of software and support services being offered by a Connecticut company to potential clients nationwide. In exchange for such opportunity, it is neither unreasonable nor unfair to expect litigation to occur in the home state of the vendor, especially where such forum is agreed to by the parties. Put another way, the only circumstance that would be surprising is if a company that markets a speciality software product nationally *actually agreed* to be

---

[3]        Assuming applicable SEC regulations would allow such.

sued by potential licensees in multiple jurisdictions throughout the United States.

## III. Conclusion

While it is clear from the arguments of the defendants that it desired this court to first address their arguments as to dismissal,[4] the undersigned finds that such decisions are better made by the court in which this case will actually be resolved and one which is familiar with the law of the forum, which was also agreed to by the parties. Thus, the undersigned will not recommend reaching the motions to dismiss, leaving those for resolution by the court in the District of Connecticut.

Having considered the well-reasoned briefs of respective counsel, as well as reviewed current case law, the undersigned will respectfully recommend that the district court, in its discretion, allow defendant's alternative Motion to Transfer Venue under Section 1404(a) and that this action be transferred in its entirety to the District of Connecticut, New Haven Division.

---

[4] Indeed, the undersigned has not discussed the usual Rule 12 standards of review inasmuch as Rule 12(b)(3), cited by defendants, is inapplicable to removed actions for the reasons discussed above. The Rule 12(b)(6) standard of review has not been discussed as it need not be reached inasmuch as transfer under Section 1404 is warranted.

## RECOMMENDATION

**IT IS, THEREFORE, RESPECTFULLY RECOMMENDED** that defendants' alternative Motion to Transfer Venue (#9) be **GRANTED**, and that this matter be **TRANSFERRED** to the United States District Court, District of Connecticut, New Haven Division, for disposition.

The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(C), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **ten (10)** days of service of same. Failure to file objections to this Memorandum and Recommendation with the district court will preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986); United States v. Schronce, 727 F.2d 91 (4th Cir.), cert. denied, 467 U.S. 1208 (1984).

Signed: November 2, 2009

Dennis L. Howell
United States Magistrate Judge